Mr. Chief Justice, and may it please the Court, this case well illustrates the real-world cost of Chevron, which do not fall exclusively on the Chevrons of the world, but injure small businesses and individuals as well. Commercial fishing is hard, space onboard vessels is tight, and margins are tighter still. Therefore, for my clients, having to carry Federal observers onboard is a burden, but having to pay their salaries is a crippling blow. Congress recognized as much by strictly limiting the circumstances in which domestic fishing vessels could be saddled with monitoring costs and capping them at 2 to 3 percent of the value of the catch. But the agency here showed no such restraint, requiring monitoring on 50 percent of the trips at a cost of up to 20 percent of their annual returns. Nonetheless, the Court below deferred to the agency because it viewed the statute as silent on the who pays question. There is no justification for giving the tide of the government or conjuring agency authority from silence. Both the APA and constitutional avoidance principles call for de novo review, asking only what is the best reading of the statute. Asking instead, is the statute ambiguous, is fundamentally misguided. The whole point of statutory construction is to bring clarity, not to identify ambiguity. The government defends this practice not as the best reading of the APA, but by invoking stare decisis. That is doubly problematic. First, at issue here is only Chevron's methodology, which is entitled to reduce stare decisis effect. We have no beef with Chevron's Clean Air Act holding, and we could not take issue with its APA holding because it failed to mention that statute. But second, all the traditional stare decisis factors point in favor of overruling Chevron's methodology. The doctrine is unworkable as its critical threshold question of ambiguity is hopelessly ambiguous. It is also a reliance-destroying doctrine because it facilitates agency flip-flopping. So the reality here is the Chevron two-step has to go and should be replaced with only one question. What is the best reading of the statute? I welcome the Court's questions. Mr. Clement, you heard the general's arguments with use of mandamus as a basis for deference. Could you comment on that? Because my understanding of mandamus is that the duty has to be clear before it actually lies. But I'd like your comment on that. Absolutely, Justice Thomas. So I think mandamus is a critical recognition of the fact that, of course, Congress can limit the remedies available in particular circumstances, and that's the right way to understand the mandamus standard. But that's quite different from telling the courts that they're to engage in statutory construction, as Congress clearly did in Section 706 of the APA, but then say there's a point at which you can't actually give us your best answer because you're deferring. And I think it's important from a separation of powers purpose to understand that it's not just remedies are different. There's an accountability difference. Because I suppose Congress tomorrow could decide that we're going to go back to a world where the only review of executive branch action is mandamus. But then Congress would be fully responsible for that highly unpopular decision. So that's the difference, I think, the fundamental difference from a separation of powers standpoint, between a limitation on remedies, where Congress does it specifically, and essentially telling the courts in the APA specifically, you have the interpretive authority over statutes no less than constitutional issues, but then overlaying a doctrine that says what we're doing is interpretation. And that's the critical thing about the interchange between footnote 9 and footnote 11. Footnote 9 tells you as clearly as you can what you are doing in a Chevron case is statutory interpretation. But then in footnote 11, it says at a certain point, you stop doing statutory interpretation, even though you think there's a better answer, and you defer to a different branch of government. And it's not the branch of government the framers gave the interpretive authority to. It's the branch of government that the framers gave the implementing authority. So I think from that standpoint, Chevron is a fundamental, egregiously wrong decision that just gets it wrong on basis of separation of powers. There's such a tension in this. Interpretive authority, everybody seems to concede, means discretion. It means there's multiple meanings that you can take from something, and someone has to choose among those meanings. It seems like most people agree if the statute uses reasonable, that Congress is delegating the definition of reasonable to the agency. And the agency is deciding what is reasonable within some outer limit, either set within the statute or within the law. But the point is that it's great rhetoric, Mr. Clement, but we do delegate. We have recognized delegations to agencies from the beginning of the founding of interpretation. And so I'm at a loss to understand where the argument comes from. Well, let me try to clarify. I think there is a difference between recognizing discretion and recognizing delegation. There are certain statutory terms, as you yourself point out, that properly construed by the courts definitively would give the agency a realm of discretion in which to operate. But there are other terms in which it is really a binary question. And the problem, the fundamental feeling of Chevron is it doesn't do a good job of distinguishing between the two. And the best example is Brand X. Broadband communications are either an information service or they are a telecommunications service. It might be hard to figure out which one, but they can't be one on a Tuesday and the next on a Thursday. It's a binary question. Oh, wait a minute. It may be binary to you, but I do know that with the development of technology and with the development of how that is implemented in terms of transmission and the Internet, that over time that's going to change. And just the same issue, even in the case that we're in right now, there were two areas that Congress looked at and knew that monitors were critical. Foreign sea travel, for obvious reasons, because there's very little that outside once those ships leave that people, that the U.S. government can do to them. And the other was the, I think it was the North Pacific area. But the point is that that doesn't mean that similar problems didn't arise later, and that the broad words giving the secretary the power to monitor and implement measures to ensure that its conservation goals were being followed wasn't given to the agency. Those are the facts that what we should be looking at, in my judgment, is this measure commensurate with what drove the similar measure, not identical, in the other two examples. And the agency should have first crack at that. If they're not similar, the court will look at it and say, your decision was arbitrary and capricious. If they are similar, we might say, okay, this is all right. I don't know the answer to that, because we really haven't dug into that. But it's just the point I'm making, which is that things change on the ground. And the definition you give today may not hold up to new facts. So facts do change on the ground. That is part of the problem with Chevron and Brand X. If there's a difficulty in classifying broadband today, the difficulty is that the statute was last passed in 1996. So figuring out whether 2023 broadband is a 1996 information service or a 1996 telecommunications service is a granddaddy of a problem. But it does have a binary answer. It's one or the other. Now, bringing it home to this statute, what I would say is, if you do the Chevron ambiguity test, you find a word like appropriate in the statute, or maybe for some people carry, though I think that one's pretty clear, and you say, that word is ambiguous, so I'm going to go to step two. That's what the court below did. But if you look at the statute as a whole, and if you looked at it the way you would in any other context, I think what you would see is, this is a classic case for exclusius, inclusius, forget the exact Latin phrase. But the point is, you have a situation where in the most commercially well-heeled fishery in the country, Congress did two things. It said you may, not must, have monitors paid for by the industry, but you must, if you do that, cap the fees at 2% to 3% of the value of the catch. Now, a Congress that did that with the most well-heeled fishery in the nation, I do not think possibly conveyed the authority to the agency to say, with a much different fishery in the Atlantic, where it's small business people, we're going to let you do effectively the same thing, but we are going to let you do it to the tune of 20% of their annual returns. I think if you strip away Chevron, this is a fairly easy case where you just say, wow, Congress had this question in mind in one place, or actually three places to be specific, and with every domestic fishery, they only gave it in two instances, and in both instances, they said it can be no more than 2% or 3% of the value of the catch. You're just arguing that the statute's not ambiguous on that question. I am arguing that the best reading of the statute is that my client wins. Now, if I have to, I would go through— Well, but it seems to me that you're not contemplating the possibility of another reason, another result. And that may be right. What you're saying is that this is not a case where there can be a number of different interpretations. But I don't think that's coming to grips with the Chevron question. Well, I hope it is, Your Honor, because what I would say is exactly what I heard Justice Kavanaugh saying, which is I don't think there is a different rule of statutory construction in cases where agency is a party than in cases where agency is not a party. In both cases, you just can't get to a certain point and say, gosh, this is hard. I think the law has run out. In both cases, you are supposed to take it all the way to coming up with your best answer. Now, if you— Well, you were just saying, I mean, that the principle of exclusio unius answers the question. And if it answers the question, I guess I don't understand how you even get to the Chevron issue. Because Chevron step one, you would give the same answer. Maybe you would, Your Honor, but nobody knows where step two ends and step two begins. And, you know, I mean, I suppose now taking the hints from Kaiser, which is about our, not Chevron, you would say, well, of course you apply all the standard canons of statutory construction before you get to step two. But the point is, in every other case, you apply all those canons, and if you're not sure about the answer, you dust off the back of Scalia and Garner and you see if there aren't some other canons. Well, because you have no other option. I mean, what Chevron is, is it's a recognition that in certain cases you apply all those tools and the conclusion you come up with is Congress hasn't spoken to this issue. And if you had no other option, you're a court. There's a case before you. You try as hard as you can, even though you know you're basically on your own. But when Chevron comes in, when there is an agency, what Chevron says is now there are two possible decision makers. There's the agency and there's the court. And what we think is that Congress would have preferred the agency to resolve this question when congressional direction cannot be found because of the agency's expertise, because of the agency's experience, because the agency understands how this question fits within the statutory scheme. So it's not a question of the court couldn't do it. It's a question of once congressional direction can't be found, who does Congress want to do it? So, Justice Kagan, I don't agree with you that the law runs out in those circumstances, even though there's an agency there. But I will give you this. If I did believe it, I would say at that point, let's give the tie to the citizen. Let's not give the tie to the agency. And I think it's important. See, I don't think it's like what we would do. You would give the tie to the citizen and I would give the tie to the agency. Chevron is about what Congress wants. And you can call it fictional all you want, but we have lots of presumptions that operate with respect to statutory interpretation. And this is just one of them. It's just saying Congress understands as well as anybody different institutional's comparative attributes and comparative virtues. And it does not want courts making, I mean, it's law, but it's policy-laden judgments. Once Congress's direction can't be found. So, Justice Kagan, if we're going to talk about what Congress wants, we probably should at least avert to the fact that we do have an amicus brief in this case from the House in its institutional capacity. And it doesn't want Chevron. It's on our side of the case. It doesn't want Chevron. It has total control over Chevron. It can reverse Chevron tomorrow with respect to any particular statute and with respect to statutes generally. And it hasn't. For 40 years, it has acceded to Chevron, except in super rare cases. It has basically said, this is the background rule. It gives us a stable default rule from which to write statutes. And we've accepted that. So, let me say three things about that. First of all, I'm not sure everybody in Congress wants to overrule Chevron. Everybody in Congress doesn't want to do everything. My point is, it's really convenient for some members of Congress not to have to tackle the hard questions and to rely on their friends in the executive branch to get them everything they want. I also think Justice Kavanaugh is right that even if Congress did it, the President would veto it. And I think the third problem is, and fundamentally even more problematic, is if you get back to that fundamental premise of Chevron, that when there's silence or ambiguity, we know the agency wanted to delegate to the agency. That is just fictional. And it's fictional in a particular way, which is it assumes that ambiguity is out as a delegation. But ambiguity is not out as a delegation. And more often, what ambiguity is, I don't have enough votes in Congress to make it clear. So, I'm going to leave it ambiguous. That's how we're going to get over the bicameralism and presentment hurdle. And then we'll give it to my friends in the agency, and they'll take it from here. And that ends up with a phenomenon where we have major problems in society that aren't being solved, because instead of actually doing the hard work of legislation, where you have to compromise with the other side at the risk of maybe drawing a primary challenger, you rely on an executive branch friend to do what you want. And it's not hypothetical. When I hear you talk about... You said you ended up in gridlock, which we have now. No. What I'm saying is Chevron is a big factor in contributing to gridlock. And let me give you a concrete example. I would think that the uniquely 21st century phenomenon of cryptocurrency would have been addressed by Congress. And I certainly would have thought that would have been true in the wake of the FTX debacle. But it hasn't happened. Why has it happened? Because there's an agency head out there that thinks that he already has the authority to address this uniquely 21st century problem with a couple of statutes passed in the 1930s. And he's going to wave his wand and he's going to say the words investment contract are ambiguous, and that's going to suck all of this into my regulatory ambit, even though that same person, when he was a professor, said this is probably a job for the CFTC. I was just going to ask you to address stare decisis. Let's assume for the sake of argument that I agree with you that in 706 Congress has spoken to the problem, that we're not applying a fictional presumption, but that Congress has told us we want courts to decide questions of law. The Solicitor General in the last argument talked about how litigants will be lining up for cases that were decided under Step 2 to seek to reopen challenges to the agency's interpretation. What do you have to say about the disruptive consequences of overruling? So I think the Solicitor General, with all due respect, will be saying the exact opposite if this court overrules the decision and will be saying no, you've got to look at it at the right level of generality. What I would say is this court has moved away dramatically from certain methods of interpretation more dramatically than just we look at legislative history less now than we used to. Implied causes of action, as far as I can tell, are dead. But that didn't mean that every decision that was decided in the bad old days was overruled ifso facto. But that's a little bit different because those implied causes of action the court was saying this is what the statute means. Title IX implies the cause of action or whatever. This would be different because the court would just be saying it may not be the best, but the agency's interpretation is reasonable. So it doesn't settle it in the same way that maybe some of those old implied cause of action cases did. If you don't want there to be disruption, all you have to do is make the precise level of generality move that you alluded to, which is I would think in every one of these Chevron cases, the question is, is the agency's interpretation of the statute lawful? And if the court has already held yes, it is lawful, I would think that would settle the matter. And as I say in our brief, the only reason I have any doubt about that is because of Brand X. And Brand X is a huge embarrassment for the government and the government's friend. I looked through the bottom side amicus. I counted 13 amicus briefs on the bottom side. Only two of them cited Brand X because gosh, it would be nice for that decision to just go away, wouldn't it? Sorry, Justice Thomas. But that absolutely makes clear that this is a reliance-destroying doctrine. And frankly, if you said that Chevron is over and all of those Step 2 cases that were decided are going to have stare decisis effect because of the level of generality point I made, you would be giving new stability to the law. It would be improving stability. And that's an important distinction from Kaiser. In Kaiser, the Kaiser doctrine, the our doctrine rather, never had its Brand X moment where this court made clear that the agency could flip 180 degrees. And indeed, in Kaiser itself, it suggested the opposite. But here with Chevron, we know this is a reliance-destroying doctrine. Here's another thing to think about in terms of Kaiser. As I read the court's decision, in addition to the fact that we know it doesn't directly speak to Chevron, thanks to the Chief Justice, I also read it as all it says is you need a special justification. Well, I think we've offered you special justifications in droves and special justification beyond the decision being wrong. And I don't know of a case where you would defer on stare decisis grounds when the relevant decision didn't cite the relevant statute at all. I mean, look, this would be a different world. If Chevron went in and wrestled with Section 706 and said, despite all contrary textual indications, that it forecloses de novo review of statutes, I suppose I'd have to be here making every single stare decisis argument. But that is not what Chevron did. It didn't even mention the relevant statute. Now, of course, I don't want to be seen as running away from the stare decisis factors, because I'm happy to walk through all of them, because I think all of them cut in our favor. The decision is tremendously unworkable. Nobody knows what ambiguity is. Even my learned friend on the other side says there's no formula for it, and that's an elaboration on what the government said the last time up here, which is that nobody knows what ambiguity means. But that's just workability. Let's talk about reliance. I talked about the Brand X problems, which are very serious problems. And I love the Brand X case, because broadband regulation provides a perfect example of the flip-flop that can happen. But it's not my only example. There are amicus briefs that talk about the National Labor Relations Board flip-flopping on everything. Ask the Little Sisters about stability and reliance interests as their fate changes from administration to administration. It is a disaster. And then you get to the real-world effects on citizens that Justice Gorsuch alluded to, but I'd like to emphasize its effect on Congress. Because, honestly, I think when the court was originally doing Chevron, it was looking only at a comparison between Article II and Article III, and who's better at resolving these hard questions. I think it got even that question wrong, but it failed to think about the incentives it was giving the Article I branch. And that's what 40 years of experience has shown us. And 40 years of experience has shown us that it's virtually impossible to legislate on meaningful issues, major questions, if you will, because right now, roughly half of the people in Congress, at any given point, are going to have their friends in the executive branch. So their choice on a controversial issue is compromise and forge a long-term solution at the cost of maybe getting a primary challenger, or instead, just call up your buddy who used to be your co-staffer in the executive branch now, and have him give everything on your wish list based on a broad statutory term. And my friends asked for empirical evidence. I think you just have to look at this court's docket. It's been one major rule after another. It hasn't been one major statute after another. I would have thought Congress might have addressed student loan forgiveness if that were really such an important issue to one party in Congress. I would have thought maybe they would have fixed the eviction moratorium. I could go on and on on these issues. They don't get addressed because Chevron makes it so easy for them not to tackle the hard issues and forge a permanent solution. My friends on the other side also talk about, you know, this is great because it leads to uniformity in the law. Well, I don't think that's an end in itself. Again, if it were up to me, if we think uniformity is so great, let's have uniformity and let's have the thumb on the scale inside of the citizen. But the reality is the kind of uniformity you get under Chevron is something only the government could love, because every court in the country has to agree on the current administration's view of a debatable statute. You don't get the kind of uniformity that you actually want, which is a stable decision that says this is what the statute means. Mr. Clement, can I ask you the same question I asked Mr. Martinez about why Chevron was initially popular? People who were very sophisticated and had a deep understanding of how judges decide what a statute means and a deep understanding of how administrative agencies work thought that Chevron would be an improvement because it would take judges out of the business of making what were essentially policy decisions. Now, were they wrong then? And if they weren't wrong, then what, if anything, has changed since then? So, Justice Alito, I think they were partially right then. So let me say what's changed and what hasn't changed, i.e. what the court missed back in Chevron. What has changed is we've come a long way in statutory interpretation. And if Chevron was a response to some of the excesses of the D.C. Circuit in the freewheeling days of the late 70s and the use of legislative history, and oh, by the way, the text of this statute appears in the margin of my opinion, and I'm not going to talk about it again because I'm off to the races. We now, I think, are all textualists. The focus is much greater on the text of the statute. And once you recognize that, you recognize the problem with deferring at a certain point to the agencies. And let's look at the track record of the agencies before this court. If they are so expert, they should be able to persuade you in case after case that they're getting these statutes right. By my count and by Cato Institute in their amicus brief, since the court last cited Chevron, the administration is batting about 300 in these cases. So expertise is not all what it's cracked up to be. And that's true even in the most complicated cases. Look at the American Hospital Association's case. I don't think you're going to find a statute that's more complicated than that one. But yet this court had no trouble unanimously saying that you can't have hospital chain-specific pricing without first doing a survey. Well, I don't know whether you can say we had no trouble. I was going to say that. No one was troubled to write a dissent. Let me put it that way. And I can use other examples. Encino, a case where this court said that Chevron wasn't applicable because of a procedural defect. Now it split the court five to four, but how did it decide the case? It decided the case with the distributive canon. Do you think the Labor Department Wage and Hour Division is the experts on the distributive canon, or do you think the courts are? Thank you, Mr. Clement. The answer from Mr. Martinez on several questions about what happens when you get rid of Chevron in this case was Skidmore. And if Skidmore is going to occupy a more prominent role going forward, I'd like to know exactly what your understanding of that principle is. So my understanding of Skidmore, consistent with Justice Kavanaugh's, is it's not actually a deference doctrine. Call it a doctrine of weight or persuasiveness. And then the beauty of Skidmore, as I understand it, I suppose the defect as well. Justice Scalia called it the totality of the circumstances. But I think the Skidmore test allows you to consider the weight of the agency's views, but then consider, is it something they came up with like right after the statute was passed so it actually sheds light on the original public meaning of the statute? Or is it something that they didn't adopt for 20 years later? Or did they adopt one policy right after the statute was passed and actually flip it over 20 years later? All of that is something that Skidmore can account for, that Chevron has never been caused to account for. Now, you can modify it, you know, a la Kaiser, and try to add all of that to it, but I do think that the Chevron experiment has failed. Well, it's usually described as a deference doctrine. People talk about Skidmore deference. Yes, they do, Mr. Chief Justice. And that puzzled me a little bit. And I went to the dictionary and I looked up deference, and the most common definition is yielding to the will of another. And I think if that's the definition of deference, then you shouldn't apply Skidmore in a way where you actually say, all right, this is super close, and I think I have the right answer, but I'm going to yield to the position of the executive branch. Skidmore has been understood to mean or said. It said that the persuasiveness of the government's interpretation depends upon the circumstances and some of those you enumerated. Absolutely. Call it what you will. That's what it is. Look, I don't mean to be pedantic, but I do think that calling it deference sort of gets you to footnote 11 land in a junior varsity way, and I think that would be unfortunate. And the other great thing about Skidmore is it – Oh, sorry. Skidmore, I don't know what a Skidmore means. Skidmore means if we think you're right, we'll tell you you're right. So the idea that Skidmore is going to be a backup once you get rid of Chevron, that Skidmore means anything other than nothing. Skidmore has always meant nothing. Justice Jackson, the earlier one, would beg to differ with you on that score. He thought it was quite important, and I think if you look at the Skidmore case itself, he took into account the Wage and Hour Division's view of waiting time and, ironically enough in that case, said we can't have a bright line test one way or another because the agency has looked at this and thought a lot of time, and it's really going to be more fact-dependent than that, and we can take that into account. I think in some of these situations, you are going to be able to look at the agency's expertise and make a judgment that this is in their bailiwick. They've really made some pretty good points. But in other contexts, you're going to see that what the agency wants you to defer to is its own view that, in this case, we ran out of money, and it sure would be nice if we could just impose this fine and continue to monitor these people at a 50% rate by making them pay for it instead of us having to pay for it. I mean, there's no expertise there. Thank you. Justice Thomas? Justice Alito? Ms. Fortenbeer? Justice Kagan? I guess what I'm struck by, Mr. Clement, and Ms. Palos from this Skidmore thing, because Skidmore is not a doctrine of humility, but Chevron is. Chevron is a doctrine that says, you know, we recognize that there are some places where congressional direction has run out, and we think Congress would have wanted the agency to do something rather than the courts. We accept that because that's the best reading of Congress and also because we know in our heart of hearts that agencies know things that courts do not. And that's the basis of Chevron. And then you take that doctrine of humility and you put on top of it stare decisis, another doctrine of humility, which is to suggest we don't willy-nilly reverse things unless there's a special justification. Here, Kaiser said, it's even more than that. There's even more reason not to reverse something because there have been 70 Supreme Court decisions relying on Chevron, because there have been 17,000 lower court decisions relying on Chevron. And you're saying blow up one doctrine of humility, blow up another doctrine of humility, and then expect anybody to think that the courts are acting like courts. With respect, Your Honor, this court has on multiple occasions corrected its own errors when it comes to statutory interpretation, how to deal with qualified immunity, implied causes of action. In the Encino motor case, there was a canon of construction that said exemptions to FLSA provisions should be construed narrowly. This court overruled that and said that should have no role to play in interpreting the FLSA. It didn't run through the stare decisis factors. So I think there is, I don't know whether you call it humility or just clarity, but when the question is judicial methodology, I think it's very weird to ask Congress to fix your problems for you. I don't think you actually want to invite in all candor that particular fox into your hen house and tell you how to go about interpreting statutes or how to go about dealing with qualified immunity. Because there are five justices, a majority of this court made clear that our deference was subject to normal judicial, normal principles of stare decisis. And to the extent that there was a ratchet up or a ratchet down, it ratcheted them up because it understood that that deference decision supported, was the basis for tens, hundreds, thousands of other decisions. So I'm going to be at a disadvantage in debating what exactly Kaiser held. But the way I read Kaiser is it said that you need a special justification beyond the decision being wrong. I think we've given you that in spades. Kaiser did not, with all due respect, wrestle with Saussure against Katz. It didn't wrestle with Gaudin in the opinion. So I think I can reconcile all your law by saying, all right, when it's a procedural rule or a court made rule of interpretation, maybe we look to some of the same factors, but they don't apply with the same weight as they would if it were a substantive result. And that does make sense because, at least under our view of the world, when you move on from a bad methodology, you don't overturn all those decisions, those substantive decisions. They still stay there. So Section 1982 still has an implied cause of action. Section 1981 still has a cause of action. I could go on and on. Those cases don't get overturned. Thank you, Mr. Clement. Justice Gorsuch? One lesson of humility is admit when you're wrong. Justice Scalia, who took Chevron, which nobody understood to include this two-step move, as originally written, and turned it into what we now know. And late in life, he came to regret that decision. What do we make of that lesson about humility? Look, I do think that reconsidering, particularly a methodological error, is part of judicial humility. And I do think if you look at Justice Scalia's Perez opinion, the mortgage banker cases, one of the things he said there most clearly, but he said all along, was our decision in Chevron was completely heedless of Section 706 of the APA. And if you're looking for a special justification to overturn an opinion, I think whiffing on the underlying statute entirely has got to be at the top of the list. Thank you. Justice Kavanaugh? A couple questions. First, on Skidmore, I just want to say how I've thought about it, and you can tell me whether this is wrong, that it respects contemporaneous and consistent interpretations as evidence of the proper, original meaning of the statute, because that's kind of common sense in statutory interpretation more generally, that if an interpretation was contemporaneous and consistent, it's more likely to be correct. So that's respect, but the word deference I wouldn't have used there. I think you have that exactly right. And one of the virtues of looking at Skidmore that way is it is consistent with a principle that this Court articulated in the Christopher v. Smith-Klein-Beckman case, which is sometimes the industry is the one with a consistent, long-term understanding of the statute that goes all the way back and sheds light on the original public meaning. And it seems to me Skidmore allows you to say if the industry says it's taking a position that's consistent from the beginning and the agency flips 25 years into the enterprise, Skidmore gives you the tools for saying, all right, agency, you're going to lose that case, Chevron doesn't. Right. A big difference between Skidmore and Chevron, there are others, is when the agency changes position every four years, that's going to still get Chevron deference, but Skidmore, with respect to that interpretation, would drop out because it's not been consistent and consistent from the contemporaneous understanding of the statute. Absolutely. Flip-flopping is a huge Skidmore minus, and it's a matter of indifference, or actually if you look at some of the things that Justice Scalia said in the beginning, when he was enthusiastic about the doctrine, he viewed the fact that agencies could flip-flop under Chevron as being an affirmative virtue. And Justice Kagan raises an important point about judicial restraint or humility in terms of Chevron, and that's an important concern for any judge. I think the flip side why this is hard, the other concern for any judge is abdication to the executive branch running roughshod over limits established in the Constitution, or in this case, by Congress. So I think we've got to find, that's why it's hard, find the right balance between restraint and letting the executive get away with too much. On that front, there was questions earlier, do judges really rely on Chevron? Do you want to speak to that? No, I'd love to speak to that, because I think that's an important consideration. I mean, one of the premises of one of Justice Kagan's questions in the first argument was that you rarely get to Chevron Step 2, but there are statistics on this. There is the most exhaustive survey of over 1,000 cases by Barnett and Walker. We cite it on page 33 of the Blue Brief. It found that courts were reaching Step 2 in 70% of the cases, 70% of the cases. The Cato Institute Brief, you might think, well, things have gotten better, because that was a longitudinal study over a number of years. You might think, well, things are getting a lot better because we've signaled that Chevron is on sort of life support. But the Cato ran the numbers for like 2020 and 2021, and it's down to 60%. But still, well over half the time, your average judge in the Court of Appeals is getting to Step 2, and Judge Ketledge, you know, he hasn't updated that speech, but as far as I know, Judge Ketledge still hasn't gotten to Step 2 once. And, you know, that's an unsettlement in the law. That's a disconnect in the law that it's very hard to get your fingers around. Like at least if, you know, one circuit says the statute means X and another circuit says Y, everybody can see that, cert can be granted, this court can resolve the case. But if courts are deciding some cases Step 1, some cases Step 2 in ways that are radically different, I don't even know how you really unearth that. So I think that's another huge problem with this. One last question. If Chevron were overruled, I think your brief says we should go ahead and decide the issue, the statutory issue in this case. Can you speak very briefly to why? Very briefly, because I think it would give a great illustration of how to do plain old-fashioned statutory construction. It would also be a useful object lesson in how far very good judges get astray by applying Chevron. Because another problem with Chevron, I'll still try to be brief, it tends to focus on one or two terms and ask whether they're ambiguous, and you lose the context of the statute. I think if you have the context of the statute and the fact that the only other places they put these kind of fees on domestic fisheries, they put a serious cap, and then they did it only for the most well-heeled fisheries or in special circumstances, this is an easy case doing good old-fashioned statutory construction. Thank you. Justice Barrett? So we have a host of canons, clear statement rules, some of which are constitutionally inspired, and when I asked the Solicitor General in the last argument about whether Chevron should be thought of as part of that package, she said that Chevron stood distinct, that Chevron was unique. Can you address that? I think she's right about that. I think it sits out there like an island, and that's part of the reason to overrule it. I think all the other canons that I can think of are fully consistent with de novo statutory interpretation. I might be missing one, but the ones I think of is when you're doing de novo statutory construction, you take into account all of those canons. Chevron's the only one I know that says that at a certain point you just stop the de novo stuff and you sort of surrender even under circumstances where if the agency weren't a litigant you would keep going. Only Chevron does that. One last question. You said, you know, you pointed out that on our docket we've had multiple cases in which the major questions doctrine has come up. Do you think that overruling Chevron is going to solve that problem? Because in a lot of those cases the agency has hung its hat on words like appropriate, you know, and the kind of language which I think, and you can tell me if you disagree about this, I think you agree that when a statute uses a word that leaves room for discretion like appropriate, feasible, reasonable, that that is a delegation of authority to the agency. So don't you think agencies will still continue to rely on words like that in ways that might not, you know, limit our emergency docket? I'm not so naive to say that overruling Chevron is going to solve all the problems with the emergency docket. But it is going to make it a lot better. Because, sure, there's some places where they use appropriate or they try to use modify, which was bold in light of AT&T, but whatever. They pick some of these words that are more capacious. But that broadband case is coming here. That's a case that shouldn't be Chevronized. You know, someday somebody is going to litigate whether crypto is an investment contract. Just as Kagan is confident that, you know, AI is going to get here because of the statute, I think it's more likely that Congress is going to say, well, there's some scientific officer in commerce. We'll let them fix the problem. So my own view of this is it's not a cure-all, but it's going to move things very much in the right direction. Thank you. Thank you. General Preluder, welcome back. Thank you, Mr. Chief Justice, and may it please the court. Throughout this litigation and at times this morning, petitioners have sought to characterize this case as presenting a fundamental question of the separation of powers and a test of Article III. Will courts continue to say what the law is? But I think stepping back, I want to make sure that what doesn't get lost in the shuffle is that petitioners have made an important concession that I think illustrates that the issue here is actually far narrower and that their attacks on Chevron lack merit and are unnecessary. The concession is this. Petitioners acknowledge that Congress can expressly delegate to agencies the authority to define statutory terms and fill gaps. Imagine, for example, if the statute said in Chevron, stationary source as defined by the administrator. I take those petitioners to give that up and recognize that is a delegation and courts should respect that. The role of the court in that circumstance is to make sure that the agency has followed the proper procedures and stayed within whatever outer bounds Congress itself has set. And all of that complies with the Constitution, of course, because Congress has Article I authority to delegate gap-filling authority to agencies and the executive has Article II authority to fill in those gaps. That's a core exercise of the executive power. And then the Article III courts are just fulfilling their judicial role when they give effect to what Congress has done and its choice to rely on the agency in that regard. But I think what all of this shows is that the constitutional attacks on Chevron and the suggestion that it's egregiously wrong in that regard lack merit because there is no constitutional distinction between that kind of express delegation and the delegations recognized in Chevron. If Congress can expressly vest an agency with authority to interpret the law through an express delegation, then it can do the same thing implicitly, especially in a world where Congress has to provide the agency with the express authority to carry the statute into operation with the force and effect of law. Now, we can debate, of course, whether Chevron drew the right line in identifying exactly when these delegations have occurred. I think the court got that right for all of the reasons I've tried to explain this morning. But I think it's important to recognize that that debate doesn't have a constitutional dimension to it. That falls out of the equation. Instead, it's just a question of whether the court drew the right line in identifying when a delegation has occurred. And if you recognize that, then I think what's left over are the practical concerns that have been raised about Chevron. And I don't want to diminish the force of the concerns that some members of the court have articulated. But I also think that those concerns are manageable. The court could do in this case what it did in Kaiser. It could clarify and articulate the limits of Chevron deference without taking the drastic step of upending decades of settled precedent. And I think that's the right thing to do here. You know, my friends in their briefs both said judges should aspire to be like umpires calling balls and strikes. The stare decisis is part of the rules of the game here, too. And in this case, I think all of the stare decisis factors counsel in favor of retaining Chevron. I welcome the court's question. How do we discern delegation from statutory silence? So, Justice Thomas, I think that it would be wrong to suggest that you can neatly categorize cases as those involving silence and those involving ambiguity. And the reason for that, I recognize that Chevron itself used both of those terms, but I think that the court was just trying to be comprehensive about those kinds of circumstances where Congress hasn't itself directly resolved an issue. There's never going to be total silence in a statute. At the very least, the agency is going to have to be able to point to the express delegation of rulemaking authority, the directive from Congress to put the statute into effect with the force of law. So that will always be at least a baseline in this context. And then in the mine run case, you'll be able to point to any number of additional features of the statute that help to signal the agency's authority. And actually, this case is a perfect example because my friend said that the Madison-Stevenson Act here is silent on the issue of whether the industry can be required to pay for monitors. But we have four different provisions of the act that we've pointed to that undergird the agency's authority. There's the provision that expressly says that the agency can require the vessels to carry the monitors. Then there's the definition of what a monitor is under the statute. It can include a private third party. Then there's the penalty provision that says in a circumstance where the vessel owner has contracted with a private third party and not paid, the agency can penalize. And finally, there's the residual authority to enact necessary and appropriate terms in these fishery management plans. So we don't think that this is a case about silence at all. General, yeah, that's really good. Again, we're back to the same question the chief had of Mr. Clement. That's a really good statutory interpretation argument. It sounds like exactly the bread and butter of what we do every single day. And we can resolve that, right? We think that you could find that the statute is clear, but I think that... The fact that you think it's clear and Mr. Clement thinks it's clear, but a court below thought it was ambiguous, should tell us something, shouldn't it? No, I disagree with that. And I should say that I think actually if you look at both what the D.C. Circuit and the First Circuit were doing in these cases, they recognized the force of the argument. The D.C. Circuit, it's true, and Loper Bright acknowledged that ultimately it couldn't conclude with confidence that the statute definitely authorized the agency explicitly. But you think it does. We think that there is a lot in the statute. Yes, you think you win under step one, and so does Mr. Clement. Here we are. I don't think it's at all unusual to find a case where the government thinks it has both the clear interpretation of the statute on its side and that the agency has acted reasonably. Because we have this ambiguous ambiguity trigger, but nobody knows what it means. Now, let me just ask you about the delegation, your example in the opening, which is interesting. I totally understand a statute that does delegate. You make up what rate you think, and that might pose a delegation problem. It might not. Fine. But we know Congress delegated. That's one thing. What you're asking us to do is infer from a linguistic ambiguity that may not be the product of any intent at all, and might mean or in some circumstances, and infer from that not that we should go to look at statutory context and other clues within the statute itself to determine who has the better reading, but the government should always win that case. No, not at all. Of course you should look at context. That seems to me very different. Sorry, just to finish up. I understand the delegation in one context, but I struggle to see that we should infer the fiction of delegation of the second always and necessarily. So I disagree that there is a fiction of delegation in the circumstances that trigger Chevron. At the outset, I want to make perfectly clear that, of course, the statutory context and structure is one of the important tools of interpretation that a court should use at step one. So if we are in a world where the court can walk through those factors and ascertain that Congress spoke to the issue, let me just be very clear, we recognize the court then should give effect to what Congress is saying. And if what you're suggesting then is that in a world where Congress hasn't actually spoken to the issue, the court should give no respect at all to the agency's interpretation, I disagree that that is basically implementing Congress's intent. Because what Chevron recognized is in a circumstance where Congress hasn't spoken to the issue, given the express grant of adjudicatory or rulemaking authority to the agency and necessarily recognize that the agency is going to have to fill the gap along the way, it is perfectly sensible to presume that Congress would want the agency to do it. Let me just ask you about Michigan v. EPA, too, because that had a very broad, somewhere between the example you gave of agency go forth and come up with rules and a linguistic ambiguity about the meaning of the word and. And it said, essentially, appropriate, necessary. And the court found there were outer boundaries even there that can be exceeded, right? Yes, absolutely. And we're not suggesting that in a world where you're at risk. So courts can do that, right? So what I'm disputing is the idea that there is always a binary answer either way, rather than a vesting of discretion. There's a binary answer in Michigan v. EPA, right? There was a particular agency regulation that was under review. But if I understood my friend correctly today, he seems to suggest that in all statutory contexts, you can look and say Congress dictated it. There is a binary answer with respect to broadband or there's a binary answer with respect to how to define stationary source. And what Chevron recognized and what I think is just absolutely true as a matter of the on-the-ground realities and how Congress legislates is that Congress doesn't actually decide all of these issues. What Chevron recognizes is that when Congress hasn't decided it and some follow-on person is going to have to fill in the gap and it's a question of whether it should be the courts or the agency, there is a presumption here that Congress intended it to be the agency but always subject to those guardrails about making sure the agency's construction is reasonable. Mr. Clement suggested that we should ignore Chevron because it didn't deal with 706. Do you have a theory as to why it didn't address 706? And how do you respond to that part of his argument? Yes, so my theory for why Chevron didn't address 706 is because 706 has never been understood at any time at the time it was enacted or in any of the eight decades since to have dictated a de novo standard of review for all statutory interpretation questions. So there was no inherent tension between Section 706 and Chevron. I think it's actually just further confirmation of what the APA's own history shows. As I was trying to explain in the first argument, this is a situation where the court has recognized that the APA wasn't meant to create dramatic changes. And it would have been a dramatic change going from all of the deference principles that had been deployed, particularly in cases of ambiguity in the case law, including immediately leading up to the APA, to a de novo standard on a prospective basis going forward would have been a big change in the relationship of how judicial review occurs for agency action. But no one mentioned that. No one suggested at the time that that was the right way to interpret the APA. It's never how this court has interpreted it. And I think this is an important point, Justice Barrett, in response to your questions about the APA. You know, it's not as though this has just been a one-off decision. The court has had any number of decisions over 70 applying Chevron. And I think in each and every one of those, it's important to recognize that there hasn't been this kind of inherent tension between the APA and Chevron itself, which just I think further shows the court's own understanding of Section 706 is entitled to some weight here. So I have a question about the relationship between Brandeis and your suggestion that we Kaiserize Chevron, essentially. So I understand Brandeis to say that a court must let go of its best interpretation of a statute if an agency advances an inferior but plausible one. But you told us that one way to handle this would be to emphasize footnote 9 and say what we said in the Kaiser context, that no, you know, use all the tools in the toolkit and come up with your best interpretation. So why wouldn't adopting your approach require us to essentially repudiate Brandeis? So if you understand Brandeis to hold that the court can think it has a best interpretation, it has figured out what Congress was saying about this issue and Congress spoke, and nevertheless has to adopt some inferior agency interpretation, then that is inconsistent with our approach. We don't read Brandeis that way. I understand Brandeis to be distinguishing between Step 1 and Step 2 holdings. So if there is a Step 1 holding where, in fact, you know, the court has got it at the end of the day and recognizes that Congress spoke to the issue, there's no room under Brandeis to let an agency come along after the fact and say the statute should be understood some different way. It's only in the circumstance where there was Chevron deference granted under Step 2, and part and parcel of that is recognizing that that's because the statute was interpreted at the first time to not actually supply an answer dictated by Congress and instead to give the agency direction. Does the court have a best answer if it's a Step 2 question? I mean, it seems to me that having a best answer suggests that you engaged in the question of statutory interpretation, came up with your best answer, and it might just be really hard. So sometimes if a court outside of the agency context confronts a difficult question of statutory interpretation, it might say, look, I'm 90% confident or I'm 95% confident, but I think your reading of Brandeis might depend on what the trigger for ambiguity is, right? Well, I do think that it's kind of clearly demarcating the lines between Step 1 and Step 2 holdings, and so at least the rules of the road are clear with respect to when an agency might have been granted discretion to revisit its prior conclusions. If you're suggesting that there's a way to read Brandeis to say that even in a circumstance factoring into the equation the possibility that Congress meant to delegate to the agency, that there is a better interpretation, a best interpretation that Congress actually resolved it, I just don't think you would ever get into the Brandeis scenario because that sounds to me like a Step 1 ruling. And I take the point that there is some inherent, you know, lack of precision in a term like ambiguity. That's not something that's uniquely created by Chevron, of course. There are ambiguity triggers in the laws in all kinds of contexts. But it's also that kind of indeterminacy that might be worrying you is not anything that's cured by overruling Chevron because as I was saying to Justice Kagan in the first argument, I think it will just open up a world where there is a lot of indeterminacy and inconsistency in how judges are applying the principles in the case of ambiguity. On that point, some of the amicus briefs and the briefs point out the experience of some of the states with Chevron. Some states don't have Chevron, and other states have had something like Chevron but have eliminated it in recent years and decades, and their experience, they say, has shown that it's plenty workable in such a regime. So I just want to make sure you can respond to that. Yes. So my understanding is about half the states still have something akin to a principle of deference. There might be some variance with respect to how much it looks like Chevron. But I acknowledge that some states have abolished any form of deference to administrative agencies. I do think that there is a lot less concern at the state level about the lack of uniformity or consistency. So one of the values that Chevron implements and recognizes for why Congress would prefer for an agency to be able to set these rules and for the courts to respect that is the value in ensuring that there are uniform rules throughout the country. And I don't think that that same experience exists at the state level. And I would add as well, in a lot of states, I think the political accountability rationales could differ as well because many state court judges are elected. Did I understand you in response to a question from Justice Thomas to say that Chevron doesn't apply to constitutional questions? Yes, it's only a doctrine that applies in the context of statutory interpretation. Well, I know, but how you interpret statutes certainly can have an effect in raising particular First Amendment questions or otherwise. Does it apply in that situation? The Department of Education has some rule. This applies to all schools. And it can apply to religious schools because this is how we interpret whatever the impact of the rule is. And when we interpret it that way, we don't think it raises any free exercise problems. So is there Chevron deference there? So I think that if a particular interpretation would create serious constitutional problems, then the doctrine of constitutional avoidance is one of the traditional tools that the court can consult in order to understand whether Congress looked to the issue. Yeah, and the agency says we don't think this causes particular constitutional problems. That's our expertise about how we apply this provision. And given that, we think there's no free exercise problem. No, a court would not defer to that because this is all happening at step one. I think that this is part of the process of the court determining whether Congress spoke to the issue. And the court has been very clear that deference doesn't come in at all until you get to step two. So, for example, the agency's view that it deserves Chevron deference or its kind of take on one of those step one issues, it's not itself meritorious of getting any deference at that stage of the case. I do want to take another shot at trying to explain why I believe petitioners are wrong to have characterized Chevron as resting on a fiction. And I think what they have tried to say is that this doesn't really reflect what Congress is intending. But I see three principal problems with that. The first is that I think that actually looking at it from a matter of first principles, there is a lot of merit and weight to the recognition that in a situation of genuine ambiguity, there are good reasons for Congress to want to vest the expert agency with this kind of authority. It's the recognition that agencies of necessity are going to have to fill in the gaps. And many of these programs are complex. They're technical. They're going to require the agency to draw on its longstanding experience with the program and the expertise that's accumulated in working within that regulated industry in order to make a sensible regulation that also will encompass, I think, inherently some policy considerations. Congress would know that the agency can run a centralized decision-making process in doing this. Chevron only applies in circumstances where there is a sufficient level of formality in the agency's decision-making. That's usually notice and comment rulemaking. And that's a process where all comers can come in and tell the agency, here are our views. Here's what you should think about in terms of regulating. That notice point is very important, it seems to me, to your argument, because the rationality of a supposition that Congress would want to favor the government rather than a supposition equally rational that it would want to favor individual liberty is made a little more weighty if you assume that the government's provided everybody a notice, an opportunity to be heard. But often the government seeks deference for adjudications between individual parties and then apply that to everybody without notice to them, or deference for interpretive rules for which no notice and comment, let alone formal rulemaking or adjudicatory proceedings is required. And so there are many circumstances in which the government does seek deference for a view of the law that affected parties had no chance to be heard about. Why don't we do that? So I think with respect to the category of interpretive rules, it's true that the court hasn't ruled out that those can receive deference in appropriate circumstances. So you'd have us kaiserize that? Well, I would just have the court reiterate what it said in Mead, which is it's not as though any agency pronouncement is necessarily going to warrant deference. Everybody knows what Mead means. I mean, it's got seven factors to it, and the lower courts complain about that too. So I don't know about that. I mean, is that another factor we're going to add to Mead? I think that Mead is an important check on ensuring not only that there's been a delegation here, but that the agency has used the appropriate process and procedures. Okay, so interpretive rules would be out under your new... So I think they raise a much harder question. A harder question. Do they rule in or out on your theory? I think the court has not ruled them out under Mead. What would you have us do? I would have you retain Mead, which recognizes... What would you have us do with interpretive rules is my question, not Mead. I mean, I don't know what to do with Mead. Well, I don't think that you can treat them as a class. I think it's going to depend on the nature of the particular interpretive rule. Sometimes notice is required and sometimes it isn't. How about adjudications? You keep those in, I'm sure. Yes, I certainly think that Chevron has core application to adjudications, and I agree that in that circumstance, there's not the same ability to take the input from all comers. But the court has emphasized that in the mine run case where it has been applying Chevron deference, there is this possibility at least of a centralized decision-making process in order to ensure that the agency at least is gathering the facts and has the tools at its disposal. And the alternative to each of these, Justice Gorsuch, is to have the courts do it through piecemeal litigation. At the very least, I think that it's easy to see why Congress might think that is not as good of an alternative in a circumstance where the court's pronouncements could come out of nowhere with respect to a particular party. We have an amicus brief from the small business. Except for everybody gets to litigate their case. Everybody. But I think that it's important to recognize that particular decisions can have impacts on parties who are outside. As a matter of precedent, possibly within that jurisdiction. But even that person who's bound by the precedent can appeal it all the way to the Supreme Court. Everybody gets their day in court. Absolutely. Versus under your view, many people without notice, any notice or any chance to be heard, are bound. No, so my concern and what I was focusing on with respect to the prospect of disrupting expectations with respect to litigation is that it's not as though every party who might stand to be affected by a case is necessarily going to know about it. Look at the amicus brief that was filed by the small business association. Of course they're not going to have notice about somebody else's case. But when the government comes for them, they get to take their case to court. Obviously when they are a party, they have an opportunity to participate. They get to appeal. But Congress has often expressed a preference for not having these kinds of issues resolved piece by piece in different courts around the country with the prospect of the disuniformity that that would create. Yes, it is provided for formal and informal rulemaking and adjudications. And it anticipated most rules would be resolved that way. In fact, they aren't. For a long time, those processes haven't been used. And agencies rely on informal adjudications and informal rulemakings. And really now today, perhaps as a product of Chevron and two, agencies have abdicated that and are moving more and more toward interpretive rules where they don't have to provide notice and comment. But I think that does circle us back to the fact that the court has not suggested that interpretive rules are necessarily going to trigger deference. And so I think at least in the mine run case that this court has looked at, it's the product of a formal process from the agency. And I think it's an important process. On the adjudications front, I think one of the amicus briefs talked specifically about the NLRB in particular and how that agency moves from tolerant to post fairly often and concern raised there, because that is a situation. You can't adjust your behavior ahead of time necessarily based on a new rule, new change interpretation, which is done in the particular case and affects the people who didn't have notice. Any response to that brief or that scenario? Or want to tell me why that's wrong? Well, I guess my overarching response to that set of concerns is that the agency has to justify its decision-making with respect to whatever tool it's using to implement the statute in the way that Congress directed. So if Congress is telling the agency you should adjudicate or you should conduct notice and comment rulemaking or giving it its authority to choose between those tools, the agency in either context is going to have to justify what it's doing. And in particular, my friends have focused a lot on the idea of agencies changing their minds. There are burdens in this context. The agency has to take account of reliance interests. A lot of this gets put into State Farm, of course, but I think also at Chevron Step 2, with respect to reasonableness, a court can permissibly take those kinds of considerations into account. Thank you. Did you want to finish your answer about what you would say to your friend's view of fictionalized intent? Yes, so I was trying to defend Chevron as a matter of first principles, and that was kind of the first-order answer on this. There are often really good reasons why Congress would want an expert agency to take the first crack at filling in the law, and there's no way around it. As the agency is administering the statute, the agency has got to do it, and this court has said that a core feature of executing the law is interpreting statutes along the way, understanding for the agency what the law means. The second point I wanted to make is that even in the situation where you think there's more room for doubt about exactly what was happening in 1984 and what Congress would have expected, this is a really foundational precedent from the court. It's not like Chevron has flown under the radar and Congress is unaware of it and doesn't realize it's out there and kind of setting the ground rules for how this court and lower courts are going to understand what Congress is doing. This is one of the most frequently cited decisions from the court, and in that context in particular, I would think that the inference of legislative intent becomes all the more sound because Congress has not chosen to displace it, and as well it triggers, I think, that critical, strong form of stare decisis that the court applied in Kaiser when it recognized that in a situation where Congress is actually the best institutional actor to do something about it, it matters. It matters that Congress hasn't sought to change Chevron in any kind of fundamental way. Thank you, counsel. I do have one more. I'm sorry. I was waiting for us to go around. I know this is not a heady intellectual question, but how do you respond to Mr. Clement's point about the interpretation of this particular statute and his reliance on the theory that this Congress definitely, when it capped a big industry paying 2% or 3%, whatever the number is, would not have wanted small fishermen to pay 20%? So I have a range of reactions to that. My first is, as I was suggesting to Justice Gorsuch and to Justice Thomas, we think that there is a lot in this statute to support the agency's exercise of regulatory authority here, and I want to point in particular to the penalty provision, which specifically contemplates that the regulated vessels might have a contractual relationship with third-party monitors and therefore might be in a situation where they haven't paid, and it says the secretary can sanction in that circumstance. So it's premised on the idea that there will be certain circumstances when there is that direct relationship. Just as a footnote in the schedule, in the way that Congress did the other two monitors, they were always government monitors, not independent monitors, correct? Yes, so there are three fee-based programs that my friends have relied on to try to support this idea that there's a negative inference you should draw from the statute. Two of those apply in the domestic context, and those operate as pure fee-based programs, so it's very different. Ultimately, they pay fees to the government. The government provides a range of services, including providing the monitors, entering into the contractual relationship, and having those monitors be government contractors, and those programs also pay for particular administrative expenses that would not be a part of this program. The foreign vessel program likewise operates in this fee-based way. There is a residual part of that program, which contemplates that in a circumstance where there aren't sufficient funds, it might be possible that the regulated vessel will then, through a supplementary authority, be required to contract with the monitors directly, and I think my friends would say, well, that's the whole explanation for the penalty provision, but it doesn't work because Congress put that penalty provision in an overarching section of the Act that applies to domestic vessels, too. If this was really just meant to be a tendril to tack on to the foreign vessel program, that would be completely inexplicable, so I think that they don't have a persuasive response to the penalty provisions here, and they say, to wrap this up, that it's unheard of to charge 20%. I do want to be really clear. They are latching on to a part of the rule that acknowledged that earlier versions or studies had suggested that costs could go potentially up to 20%, but then the agency acted in response to that. It created waivers, it created exemptions, and with respect to some of the types of fishing at issue in these cases, the estimated costs were more in the range of 2% to 3%. So this is all something that courts can look at and review. They, in fact, pressed arguments that this rule was arbitrary and capricious for neglecting to give full attention to the costs. The lower courts rejected those arguments, and I think rightly so. Justice Kagan? Justice Barrett asked before about kaiserizing Chevron, and I just wanted to ask, what would that mean? I mean, would it mean doing exactly what Kaiser did to our deference, to Chevron deference? Would there be adjustments that would be necessary? Would one want to go further in any respect? What does it mean to kaiserize Chevron? So I think that the court in this case, if it has some concerns about the implementation issues, could do four critical things, which draw heavily on Kaiser but I think look a little different in their particulars. The first thing the court could do would be to reemphasize the rigor of the Step 1 analysis. Now, this is drawn directly from Kaiser. As I mentioned before, we've seen results in the lower courts where they are now following this court's direction with respect to that. So in this regard, what the court would be saying is, don't wave the ambiguity flag too readily. Don't give up just because the statute is dense or hard to parse. Instead, there are a lot of hard questions out there that can be solved and reveal Congress's intent if the court applies all of the tools and really exhausts them. So that would take care of a whole category of cases. Then at Step 2, I think the court could again do what it did in Kaiser, which was to reinforce that reasonableness is not just anything goes. Justice Gorsuch I think at times has said it just means the government wins, but that is not actually the standard. Even at that Step 2 stage, it's obviously deferential, but the court should be enforcing any outer bounds in the statute and making sure that the agency hasn't transgressed those. I think the third thing the court could do is emphasize that this whole enterprise only gets off the ground in a me-type situation where you have the agency being directly empowered by Congress to speak with the force of law and then exercising appropriately a formal level of authority in implementing the statute. And so I think that that is an important principle as well, that there are certain contexts in which the agency is not actually speaking with the force of law or in a way that would be fitting with the delegation Congress has provided. And then finally, the fourth thing that the court could do, and I think this is a little bit different from Kaiser, would be to emphasize that it's always important to look at any other statutory indication that Chevron deference was not meant to apply. And what I'm thinking here are things like situations where the nature of the statutory question, as the court has said in other cases, isn't one where you would expect Congress to give that to the agency. There's a flavor of this in the major questions doctrine case. And I don't want to rule out other scenarios that could come up because part of our central argument here is Congress can adjust, Congress can react, Congress can take statute-specific steps, and so courts should pay attention to that. And there is nothing in Chevron that dictates that this presumption is irrevocable. Instead, it's fully rebuttable. And is there anything you would say about the matter of changed interpretations? So I think that changed interpretations already are an area where the agency is under additional burdens to justify its decision-making. I think they get a harder look. And the court has made clear that in a circumstance where an agency is changing its regulatory approach, one of the things it has to do is take full account of the reliance interests and explain why those shouldn't alter what it's doing in the kind of revised approach. The agency also frequently, if it's come from a notice and comment rulemaking, has to run that process all over again. That's a time-intensive process. It takes a substantial investment of agency resources. So I think in that context, too, the court could police the bounds of that and make sure that the agency is following the procedural requirements to ensure that it's informed decision-making. But at the end of the day, if the agency can run the gauntlet and survive those hurdles, then the fact that it has some discretion under the statute to change its approach I think is not something to say is, you know, kind of a bug in the statute. Instead, it's a feature because there are all kinds of circumstances where Congress would want to give the agency the ability to adapt to changing circumstances, to new factual information, or to the experience it's accumulated under the prior program. Thank you. Justice Gorsuch? Justice Kavanaugh? Justice Barrett? Thank you, counsel. Rebuttal, Mr. Clement? Just a few points in rebuttal, Your Honor. First, my friends started with express delegations. I think express delegations show all the problems with this fictional implied delegation because the great thing about an express delegation is you have some text. What an express delegation generally does textually is delegate implementing or executing authority. It doesn't do what Chevron purports to do, which is to delegate interpretive authority. But better yet, once you have text, you can put limits on the text. And Michigan against EPA is a perfect example of that. And, of course, all of these delegations do raise Article I non-delegation concerns. And if you have text, you can check for that as well. But I can't think of anything that's more antithetical to an intelligible principle than ambiguity and silence. And I will say, in terms of this premise, I think it's entirely fictional. I think in most cases, a statute is ambiguous because the proponent did not have enough votes to make it any clearer. My friend at one point said that I view the whole world as every statute has a binary answer. To be clear, my position was the opposite. There are statutes like that, reasonableness, appropriateness. There are also things like information services, telecommunication services, a service advisor. Is it a salesperson who is involved in the servicing of cars? I say yes, but you could say no, but it's binary. The terrible thing about Chevron is you can't tell the two apart because at a certain point, they both look ambiguous. But you know what can tell the two apart? Good old-fashioned statutory construction. Find out, as the courts, what the words mean. Reasonable is a term of capaciousness and elasticity. Telecommunication service is not. Good old-fashioned statutory interpretation can do the job. Now, let me say one thing about the mystery of why Section 706 did not appear in the Chevron decision. There's a really easy answer. It was a Clean Air Act case. The court sort of stumbled into these pronouncements about how, as a meta matter, you should go about statutory consideration. It was a mistake. It didn't wrestle with the relevant statute at all. That is a special justification to revisit the decision and to get the decision right. Let me say one word about expertise. Expertise and deference do not have to go hand-in-hand in a way that precludes de novo review. We have things called tax courts. We have things called bankruptcy courts. We have the Court of International Trade. They all deal with technical specialized issues. Every one of the legal questions are reviewed de novo. That's the basic understanding with a statute like Section 706. Lastly, let me say this. You cannot kaiserize the Chevron doctrine without overruling Brand X. The fact that you could take into account if the agency had flip-flopped was part of the rationale of Kaiser money factors before you applied it. That is a feature, my friend correctly admits. That is a feature of the Chevron doctrine, and you really can't kaiserize it without overruling Brand X. And if you're overruling Brand X, well, then stare decisis just went out the window, and we might as well get this right. Chevron imposed a two-step rubric that was fundamentally flawed. The right answer here is a one-step rubric that simply asks, how is the statute best read? Thank you. Thank you, Counsel General. The case is submitted.